UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

MIRIAM HALEY,                                                    Case No. 20-CV-9109

                              Plaintiff,

                                                                 **COMPLAINT**
              -against-                                          **AND JURY DEMAND**

HARVEY WEINSTEIN,

                              Defendant.
_____x

        Plaintiff Miriam Haley, by and through her attorneys, Cuti Hecker Wang LLP and

Allred, Maroko & Goldberg, for her Complaint alleges as follows:

                          <u>**NATURE OF THE ACTION**</u>

        1.      For decades, Defendant Harvey Weinstein ("Weinstein") was a prominent

and influential figure in the entertainment industry, a position that gave him power over young

women interested in working in film or television.  For decades, Weinstein repeatedly abused his

power by engaging in a pattern of sexual assaults against more than a hundred women.  A recent

investigation by the New York County District Attorney concluded that "[s]tarting in the

1970's," Weinstein "has trapped women into his exclusive control and assaulted or attempted to

assault them."

        2.      This case is about Weinstein's predatory sexual assault on the Plaintiff,

Miriam Haley ("Plaintiff" or "Ms. Haley"), whose testimony at Weinstein's New York criminal

trial formed the basis for his conviction on the counts that charged him with sexually abusing

Plaintiff, for which he was sentenced to a term of 20 years in prison.

        3.      Like so many other of Weinstein's victims, Ms. Haley was eager to find

work in the entertainment industry.  Weinstein used his wealth, power, and influence to pull her

into his orbit.  In July 2006, after she had rebuffed earlier inappropriate sexual advances, Weinstein lured Plaintiff to his apartment.  There he forcibly attacked her, pushing her down and pinning her to a bed.  Though she was doing her best to resist him – crying "no, no, no" while saying this was not going to happen, trying to push him away, and telling him that she was on her period and wearing a tampon – Weinstein used his superior size and strength to keep Ms. Haley pinned on the bed as he pulled out her tampon and forced himself on her orally.

4.      Ms. Haley lived with the horror, humiliation and pain that this assault caused for years.  Finally, the New York County District Attorney commenced a criminal investigation, and a grand jury indicted Weinstein for, among other things, committing a Criminal Sex Act in the First Degree against Plaintiff in violation of Penal Law §130.50(1), a class B Violent Felony.

5.      Overcoming her fear, Ms. Haley testified at the criminal trial.  The jury credited her account and convicted Weinstein.  Relying in part on Weinstein's documented history of sexual predation and Ms. Haley's statement recounting the emotional anguish his assault had caused her to suffer, a Justice of the New York Supreme Court sentenced Weinstein to 20 years in prison for sexually assaulting Ms. Haley.

6.      Ms. Haley brings this action to obtain compensation for the pain, suffering, and economic injuries caused by Weinstein's sexual assault.

## PARTIES AND RELATED ENTITY

7.      Plaintiff Miriam Haley is an individual who resides in London, England.

8.      Defendant Harvey Weinstein is an individual whose residence is in Connecticut, and who is currently incarcerated in the Wende Correctional Facility in Alden, New

York.  At all times relevant to this action, Weinstein was the Co-Chairman and a Director of The Weinstein Company Holdings, LLC ("TWC").

9.      TWC is a Delaware limited liability company, which has its principal place of business in New York.

## JURISDICTION AND VENUE

10.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because this is a case between a citizen of a state and a citizen of a foreign state, with an amount in controversy exceeding $75,000.

11.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

12.      This Court has personal jurisdiction over Defendant, who is a long-time resident of New York and remains in this State as an inmate in a New York State prison.

## JURY DEMAND

13.      Plaintiff hereby demands a trial by jury on all of her claims in this action.

## FACTUAL ALLEGATIONS

14.      Plaintiff was introduced to Weinstein in 2004 by a mutual friend, the internationally renowned impresario Michael White.  At the time, Ms. Haley worked as Mr. White's personal and production assistant and the two were good friends.  She accompanied Mr. White to the premier of the film *The Aviator* in London in 2004 and he introduced her to Weinstein.

15.      Plaintiff ran into Weinstein again in May 2006 at the Cannes film festival. Mr. White had recently fallen very ill and was no longer able to conduct his business.  Plaintiff was financially insecure and eager to find other work in the entertainment industry.  She

mentioned that to Weinstein, who suggested that she meet him in a hotel suite rented by TWC in Cannes during the festival to be used as an office.

16.     On information and belief, according to Barbara Scheenweiss ("Scheenweiss") – who at all times relevant to this action was an officer of TWC who closely interacted with and assisted Weinstein with TWC business affairs, and who was aware of Weinstein's practice of sexually harassing, molesting and/or assaulting women interested in obtaining work on TWC projects – TWC commonly booked such hotel suites for Weinstein when he was traveling so that he could conduct company business there.

17.     When Plaintiff arrived at the hotel, she met a person described as Weinstein's assistant.  On information and belief, that assistant was employed by TWC.

18.     That assistant led Plaintiff to the suite where Weinstein was working.  The assistant left Ms. Haley alone with Weinstein.  He commented on her legs and asked her for a massage.  Plaintiff replied that she was not a masseuse and suggested Weinstein call the front desk.  Weinstein then asked if she wanted him to give her a massage.  Again, Ms. Haley refused.

19.     Though she was humiliated by Weinstein's request, Plaintiff was desperate for work.  Although she did not expect him to assist her in finding work, to Ms. Haley's surprise Weinstein followed up by arranging for her to work on the set of *Project Runway*, a television show produced by TWC that was filming in New York.  (Ms. Haley lived in London at the time, but was planning to travel to New York City.)  Weinstein did so by putting Plaintiff in touch with Scheenweiss, who was working on the show.

20.     Grateful that Weinstein had helped her find work in New York and hopeful that he could further advance her career, Ms. Haley remained in touch with him.  In

response to an email from her thanking him for getting her the job on TWC's *Project Runway*, Weinstein invited Ms. Haley to meet with him at the Mercer Hotel.  She accepted.

21.     On or about June 26, 2006, Ms. Haley and Weinstein met in the lobby bar of the Mercer Hotel.  Weinstein asked Ms. Haley if she wanted a drink, but Ms. Haley – who does not drink alcohol – declined.  Then they had an appropriate, cordial meeting about the positive reviews that he'd heard from Scheenweiss about Plaintiff's work on *Project Runway*, her need to get a work visa, and other matters.  There was no sexual innuendo of any kind.

22.     As the meeting was ending, Plaintiff mentioned that she needed to stop by the Weinstein Company to pick something up from Scheenweiss at TWC's office in Tribeca.  Weinstein suggested she stop by his office when she was in the building.  Shortly thereafter, she did so.  While there, Weinstein and Ms. Haley again discussed the entertainment business, and Weinstein lent her a novel, suggesting that she read it.

23.     Weinstein then offered to give Plaintiff a ride to her apartment, and his driver (on information and belief, an employee of TWC), personal assistant (on information and belief, an employee of TWC), Weinstein and Ms. Haley drove to her home in the East Village.  When they arrived and Plaintiff exited the car, Weinstein also got out and asked which building she lived in and whether he could see her apartment.  Plaintiff told him it was not a good time, and refused.  Before leaving, Weinstein asked Ms. Haley if she would fly to Paris with him on a private plane and stay at the Ritz and see the fashion shows.

24.     The invitation was awkward because, though Ms. Haley did not want to go on such a trip with Weinstein, she wanted to have a professional connection to him in order to help her career.  Though Ms. Haley did not intend to go, she did not explicitly reject the offer at that time.

25.     Later that day, Weinstein or his assistant called Plaintiff to ask again about whether she would go to Paris with Weinstein.  She said that she would not.

26.     Weinstein did not take no for an answer.  Later that same day, Weinstein and/or his assistant repeatedly called her to continue to ask whether she would go to Paris with him.  Despite Weinstein's persistent requests, Ms. Haley declined.  But Weinstein was not through pressing himself on Ms. Haley.

27.     After the repeated phone calls that afternoon, and without giving Ms. Haley any notice that he would do so, Weinstein showed up at her apartment building.  He called her from the sidewalk and/or rang the buzzer to ask her if he could come in.  Plaintiff told him it was not a good time, but Weinstein refused to leave and repeatedly urged her to come out to the door to the building to talk to him face to face.  Plaintiff finally relented.  When she got to the door and opened it, Weinstein immediately barged in, walked past her down the hall and entered the apartment she shared with her roommate.

28.     He asked her who she lived with, and Ms. Haley said with a friend. Weinstein continued to pressure her to go to Paris, saying that she could invite her roommate to Paris who could act as her chaperone.  Again, Ms. Haley declined.  Weinstein remained insistent, almost begging her to go with him.  Finally, in an effort to dissipate his pressure, Ms. Haley explained her reluctance to go by noting that Weinstein had a terrible reputation with women. Weinstein seemed offended; he asked Plaintiff what she meant by the remark and what she had heard about him.  He then left the apartment.

29.     Although Ms. Haley was shaken enough by this encounter to tell her roommate about how Weinstein had barged into their apartment, she was at this point not frightened that Weinstein would harm her.  Despite Weinstein's stalking, Ms. Haley wanted to

retain a friendly professional connection with him, and to stay in the good graces of TWC, because she still needed work in the entertainment industry where he had so many valuable connections and TWC was such an influential company.

30.     A short while after he had left her apartment, Ms. Haley communicated with Weinstein in connection with returning the novel he had lent her after she had read it. Weinstein (either personally or through his assistant) invited Ms. Haley to go to Los Angeles to see the premiere of *Clerks II*, a film produced by TWC.  Ms. Haley, who would be traveling alone, accepted the invitation.  TWC arranged for her airfare.  (Ms. Haley accepted the offer because she wanted to see a friend in Los Angeles who was expecting a child; she intended to stay with that friend until she had her baby.)  The flight to LA was to depart on July 11, 2006.

31.     The day before her flight to LA, Weinstein asked her to meet him in his apartment.  Feeling that it would be odd to decline after having just accepted the invitation to go to a TWC movie premiere, Ms. Haley agreed to meet him.  His driver picked her up and drove Ms. Haley to an apartment in SoHo.  The driver escorted Ms. Haley into the building, up the elevator, and into Weinstein's apartment.  The driver then left the apartment.  Ms. Haley had no idea whether he remained in the building, was waiting outside, or had driven off.

32.     Weinstein was there alone, casually dressed.  The television was on, and he and Ms. Haley sat on the couch a few feet apart and were making small talk.

33.     Then Mr. Weinstein lunged at Ms. Haley and started groping and kissing her.  She jumped up from the sofa and said "oh, no, no, no, this is not happening" or words to that effect.  She tried to walk, and then push him, away.  But Weinstein was large and imposing and he pulled her toward him, kissing and fondling her.  He then forced her into a small, dimly lit bedroom with children's artwork on the walls, backing her into that room until she fell

backwards onto the bed.  Weinstein then pushed Ms. Haley down onto the bed and held her there.

34.     Ms. Haley continued to resist verbally and physically.  When she tried to get off the bed, the much larger Weinstein pushed her back down.  She continued to cry "no, no, no" and then, hoping that perhaps this would stop Weinstein, told him she was on her period.

35.     That did not stop Weinstein.  Despite Ms. Haley's continued resistance, Weinstein continued to pin her on the bed and forced himself on her orally, placing his mouth on her vagina.  Ms. Haley was continuing to cry "no" and told Weinstein again that she was on her period and wearing a tampon.

36.     Weinstein said, "well, where is it then" or words to that effect.  Then he pulled out the tampon and continued to orally sodomize Ms. Haley.

37.     After thinking through her options and realizing that she had no way to escape, Ms. Haley checked out emotionally because she thought that was the safest way to endure the assault.

38.     The conduct described in paragraphs 31 through 37 is referred to herein as the July 10, 2006 Rape.

39.     Ms. Haley promptly reported that she had been sexually assaulted to her roommate.  Ms. Haley did not call the police because she was concerned that she had worked while in New York though she had only a tourist visa and because she reasoned that given how wealthy and powerful Weinstein was any such complaint would go nowhere.

40.     On July 11, 2006, Ms. Haley flew to Los Angeles.  She did so because the flight was already booked and she wanted to see her friend who was expecting to give birth.

41.     The premiere of *Clerks II* was on the evening of July 11th, but Ms. Haley did not attend.  Weinstein and his assistant called her after the premiere that night to ask why she had not been there.  She gave some excuse for not being there.  Weinstein was agitated that Ms. Haley had not attended the premiere.  He told her he was leaving LA and would not see her and she said that was fine.  Later that month, her friend had her baby and Ms. Haley left Los Angeles.

42.     Weinstein again contacted Ms. Haley once she had returned to New York. He persistently asked her to meet with him.  Ms. Haley felt trapped – unable to report the July 10 Rape, and still needing work.  As a result, she agreed to meet Weinstein at the Tribeca Grand Hotel.  She had assumed the meeting would be, as it had been at the Mercer Hotel, in a public space.  But she was directed upstairs to a hotel room where Weinstein was.  When she arrived, he led her into the bedroom.  Ms. Haley just went numb; she had made clear to Weinstein by actively trying to fight him off on July 10th that she had no sexual or romantic interest in him. Weinstein then had intercourse with her, saying things like "you are a whore and a bitch" in an apparent attempt to turn her on.  Ms. Haley just lay there motionless, saying only "I am not a whore, I am not a bitch."  She did not want to have sex with Weinstein and never voluntarily consented to his touching; she later blamed herself for not actively resisting.  Despite that she did not voluntarily consent to this sexual contact, Ms. Haley is not asserting any civil claim for damages in this action regarding this incident.  Her battery and related claims arise from the July 10, 2006 Rape, not the incident described in this paragraph.

43.     Humiliated, violated, and ashamed, Ms. Haley returned to London on or about August 2, 2006.  Ms. Haley did her best to put her feelings about Weinstein's abuse in a box, to pretend that it had not happened to her.  She remained in contact with Weinstein for a

time, sending him scripts because he was an extremely useful industry connection to have. Ultimately, Ms. Haley left the entertainment business.

44.     Weinstein's sexual attack on Ms. Haley scarred her deeply, mentally and emotionally.  It stripped her of her dignity as a human being and as a woman.  It crushed her confidence and faith in people and in herself.

45.     Ms. Haley sought to bury the awful pain and tried to put on a brave face, preferring that people thought that the powerful Weinstein, whom everyone in the industry fawned over, liked and respected her rather than thinking of her as a victim.  But the reality is that the sexual assault forever altered Ms. Haley's life.  She no longer felt confident in her professional worth; her spirit was crushed.  Once a woman brimming with confidence, the attack left Ms. Haley feeling awkward and insecure.

46.     Once Ms. Haley was identified publicly as a Weinstein victim who was prepared to testify against him, she faced excruciating stress and lived in fear of retaliation.

47.     The period between Weinstein's indictment and trial was lengthy, with delays caused, in part, because Weinstein continually changed defense lawyers.  The delays and shifts in the schedule were stressful for Ms. Haley, who had read reports of how Weinstein used lawyers and private investigators to "target," or collect information on his victims and compile psychological profiles that sometimes focused on their personal or sexual histories to track and dissuade women from testifying against him.

48.     Testifying in public at the criminal trial was nerve-wracking and terrifying.  Ms. Haley cried with relief when the jury unanimously voted to convict Weinstein for sexually assaulting her.

49.     As a result of the July 10, 2006 Rape, Plaintiff suffered, and continues to suffer from severe and serious injuries, including, but not limited to, severe emotional distress and physical manifestations thereof.

50.     The criminal action against Weinstein for violating Penal Law section 130.50(1) by sexually assaulting Ms. Haley in the July 10, 2006 Rape terminated on March 11, 2020 when he was sentenced to prison for committing that offense.  Plaintiff's claim is therefore timely brought under CPLR § 215(8)(b), which provides that "[w]henever it is shown that a criminal action against the same defendant has been commenced with respect to the event or occurrence from which a claim governed by this section arises, and such criminal action is for . . . criminal sexual act in the first degree as defined in section 130.50 of the penal law . . . the plaintiff shall have at least five years from the termination of the criminal action as defined in section 1.20 of the criminal procedure law in which to commence the civil action . . . ."

51.     This action is also timely under CPLR 213-C because it is brought within twenty years after July 10, 2006.

**FIRST CAUSE OF ACTION**
**(Battery – July 10, 2006 Rape)**

52.     Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

53.     In committing the July 10, 2006 Rape, Weinstein intentionally subjected Plaintiff to bodily contact that was offensive in nature.

54.     Weinstein intentionally touched Plaintiff in a rude, insolent, or angry manner without her consent.

55.     As a result of Weinstein's actions, Plaintiff suffered damages in an amount to be determined at trial.

56.     At all relevant times, Weinstein was an employee of TWC acting within the scope of his employment.

57.     Upon information and belief, senior officers and directors of TWC routinely had opportunities to and did in fact observe Weinstein's exploitation of his role at TWC to sexually abuse women interested in working on TWC projects.

58.     TWC employed Weinstein pursuant to an employment agreement that expressly contemplated that Weinstein was likely, in the course of performing services on behalf of TWC, to assault women who interacted with him in the hopes of securing work on TWC projects.

59.     Under the employment contract in effect in 2006, TWC had no right to terminate Weinstein if he sexually harassed or molested such women, so long as he was not convicted of a criminal offense for doing so.

60.     Instead, TWC and Weinstein agreed to contractual terms that contemplated TWC paying settlements or judgments arising from Weinstein's workplace and/or work-related sexual misconduct, with the only consequence to Weinstein being the obligation to indemnify TWC for doing so.

61.     These contractual terms reflect that TWC knew that Weinstein, in the course of carrying out his duties on behalf of TWC, was likely to sexually harass or assault women eager to obtain work through TWC, and that TWC and Weinstein understood and at least tacitly agreed that Weinstein's sexual harassment and abuse of women interested in the entertainment industry would further TWC's interests.

62.     Weinstein's conduct was carried out within the scope of his employment, and was plainly foreseeable to TWC.

## SECOND CAUSE OF ACTION
### (Assault – July 10, 2006 Rape)

63.     Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

64.     In committing the July 10, 2006 Rape, Weinstein engaged in physical conduct that placed Plaintiff in imminent apprehension that he would harm her.

65.     At all relevant times, Weinstein was an employee of TWC acting within the scope of his employment.

66.     As a result of Weinstein's actions, Plaintiff suffered damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (NYC Gender Motivated Violence Protection Act – July 10, 2006 Rape)

67.     Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

68.     By committing the July 10, 2006 Rape, Weinstein committed a "crime of violence motivated by gender" under the Victims of Gender-Motivated Violence Protection Act ("VGMVPA") as defined in N.Y.C. Admin. Code. § 8-903.

69.     The requirement that the crime of violence be committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender is satisfied because during the July 10, 2006 Rape Weinstein sexually attacked and orally sodomized Plaintiff without her consent.  Gender animus inheres when consent is absent.

70.     As a result of Weinstein's conduct in committing the July 10, 2006 Rape, Plaintiff suffered damages in an amount to be determined at trial and pursuant to the fee-shifting provision of the statute.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendant as follows:

    a.  Awarding compensatory damages for all physical injuries, emotional distress, psychological harm, anxiety, humiliation, physical and emotional pain and suffering, family and social disruption, and other harm, in an amount to be determined at trial;

    b.  Awarding punitive damages in an amount to be determined at trial;

    c.  Awarding attorneys' fees and costs pursuant to any applicable statute or law;

    d.  Awarding pre- and post-judgment interest on all such damages, fees and/or costs; and,

    e.  Awarding such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       October 30, 2020

                        CUTI HECKER WANG LLP

                        By:  /s/ Mariann Meier Wang
                        Mariann Meier Wang
                        John R. Cuti

                        305 Broadway, Suite 607
                        New York, New York 10007
                        (212) 620-2603
                        mwang@chwllp.com

                        ALLRED, MAROKO & GOLDBERG
                        Gloria Allred
                        305 Broadway, Suite 607
                        New York, New York 10007
                        (212) 202-2966
                        gallred@amglaw.com

                        *Attorneys for Plaintiff*